Argued June 24; affirmed July 14; rehearing denied
September 22, 1936

## BECKMAN *v.* DOERNBECHER MANUFAC-
## TURING CO.

(59 P. (2d) 688)

*John F. Reilly*, of Portland (Wilson & Reilly, of Portland, on the brief), for appellant.

*William P. Lord,* of Portland, for respondent.

BAILEY, J. On April 20, 1933, the plaintiff, William Beckman, while piling lumber in a box car on a track siding of the Doernbecher plant at Coalca on the line of the Southern Pacific in Clackamas county, suffered personal injuries caused by the sudden impact of the car in which he was working and a string of five other cars switched, without warning to him, from the main line onto the siding. From a judgment in favor of the plaintiff against the Doernbecher Manufacturing Company the latter has appealed.

The defendant has a plant located on a narrow strip of land between the Southern Pacific tracks and the Willamette river about one mile north of New Era, where it manufactures the lumber and veneer used in its main factory in Portland. At this point, between the plant and the main line the Southern Pacific has a passing track approximately one-half mile long, the northerly end of this track being some 400 feet to the north of the main building of the Doernbecher plant. West of this passing track is a siding 1,056 feet long, connecting at both ends thereof with the passing track,

the northerly junction being 280 feet south of the northerly end of the passing track. It was on this siding that the mishap occurred.

The switches connecting the passing track at the north and south with the main line and the switches connecting the siding with the passing track were kept locked when not in actual use, the keys thereof retained by employees of the railroad. This siding was on property owned by both the defendant and the railroad, the right of way of the latter company extending approximately one foot west of the middle of the track. The siding was constructed in 1905 under a written agreement between the two companies, by which the defendant paid the cost of construction. By this agreement the railroad company was given full control of the track and permitted to use it at its discretion "for shipment or delivery of any freight".

The defendant loaded on the average two cars every working day. During the month of April, 1933, 42 cars were loaded. The loading crew was composed of four men. Two of them delivered the material on trucks to the loading platform, the third man remained on the platform and passed the lumber to the fourth man, who was inside the car, and the latter piled it in the car. Two crews of employees worked at the defendant's plant, on six-hour shifts, and loading operations were in progress most of that time.

Whenever any cars delivered on the siding for the use of the defendant were to be moved, the railroad company notified defendant's employees, generally its superintendent, and the employee notified then warned the men working in or near the cars on the siding. This siding serving the defendant's plant, however, was frequently used by the railroad company for storage of cars not ordered or used by the defendant. In re-

gard to this matter, Mr. Tauscher, superintendent of the plant, testified:

"Q. Mr. Tauscher, what was the practice of the Southern Pacific Company with reference to putting cars into the track at times when you did not order them? A. Well, that was being done all the time. Q. What was the practice of the Southern Pacific Company in putting cars in there, if the cars were intended by them to come in contact or in close proximity to the cars in which your men were working? A. Ordinarily they would come up and see if there was anybody working in the cars, and warn them.

*　　*　　*　　*　　*

"Q. Did I understand you to say that other cars were brought onto this track that were not ordered, by the railroad campany? A. They used it for storage. Q. Who authorized them to do that? A. They have the right to do that. Q. They have the right to do that? A. Yes, they have. Q. And brought cars down here and stored them on the track that had no connection with your plant condition? A. They knew they would be used there, and kept the spur full so there would be plenty of cars on hand.

"Q. Did they bring these cars on the track there, either for yourself or other than used for storage purposes, while the employes were at work loading the cars? A. Well, they have dropped them in there with the engine holding on to them so they would not crash into them. All times that the cars are to be moved, with anybody working there, they have always told us, up to this particular time. Q. You depend on them to tell you, is that it? A. Yes. Q. As far as you are concerned, you depended on that? A. They always have done it, prior to that time.

*　　*　　*　　*　　*

"Q. Have you ever, as superintendent of the plant, made any rule or regulation that the railroad employes shouldn't come on the track without warning the employes working in the cars? A. I never have, because

I felt— Q. (Interrupting) Never mind that. I asked you whether you did or didn't. A. I did not. No. Q. You have no warning out of any kind to warn the railroad employes not to come on the tracks without getting the men out of the cars, do you? A. No.

*   *   *   *   *

"Q. In other words, Mr. Tauscher, is this correct or not, you depended entirely on the railroad switchmen to protect the men in the cars? Is that correct? A. We depended upon them, when they came in to move cars, to come in and tell us. Q. So far as the Doernbecher Manufacturing Company is concerned, nothing was done on the part of yourself or anybody else to protect your men, other than the railroad employes did it themselves. A. No, we didn't."

A. H. Beckley, head brakeman on the freight train that switched the cars upon the siding at the time of the accident, as a witness for the defendant, testified as follows:

"Q. Have you ever informed, or any of the crew you were working with, to your knowledge, gone down and warned the employes of the Doernbecher Company that you were going to switch cars? A. Yes, sir. Q. When? A. Different times. Q. I am talking of before the accident. A. We did it several times. Q. But it was not a common occurrence for you to do it? A. If we figured on moving their cars; yes, sir. If we figured on moving any cars they were working in they were always notified. Q. But if you were just spotting some cars for storage purposes you didn't notify them about it at all? A. No, sir; because we didn't want to disturb them. We figured if we could put them in without disturbing their loading we would try to do that.

"Q. As far as any rule or regulation of the Southern Pacific Company, there is is no rule or regulation requiring you to give notice to the employes that were loading cars that you were going to make a switch?

A. Yes, we are not allowed to touch them cars without notifying them. The Southern Pacific requires us to notify them. Q. What about kicking a car onto them— kicking a car in on the track? A. If we are going to touch their car we should notify them. Q. You can't always control a car after it got started? A. There is cases we don't. Q. The fact is you can't. Isn't it a physical possibility to stop a car wherever you expect to stop it? A. We are not allowed to kick those cars in against cars that are loading; no, sir. Q. You have been doing it? A. Yes, sir; that's what we did. Q. You had been doing it before? A. Yes, sir.''

J. H. Rankin, brakeman and extra conductor on the same train, known as a swing brakeman, also a witness for the defendant, testified that he had worked for the Southern Pacific and the Union Pacific railroads, and as follows:

''Q. You are familiar with the practice generally prevailing on railroads in the Pacific Northwest with respect to switching cars into industrial sidings where cars are located for loading? A. Yes, sir. Q. What was the practice in that respect of the train employes notifying any people engaged in and about the cars, of the proposed movement? A. Well, we were supposed to go down and tell them we were going to move the cars before we touched the cars at all, and have them all out.''

Mr. Rankin identified the rule of the Southern Pacific Company applicable to this matter, which rule as read in evidence is as follows:

''When necessary to disturb cars that are being loaded and unloaded, notice must first be given to all persons in or about the cars to be moved. Such cars must be returned to the location at which found. Care must be taken to avoid injuries to persons or damage to trucks, automobiles or other property not clear.''

This witness further testified that the practice was to warn men working in box cars when railroad em-

ployees intended to connect with such cars or disturb them. He further testified thus:

"Q. Now, you say you had the practice of going in and notifying the men to get out of the cars? A. Yes, sir; that was the rule. Q. Is it rule or practice? A. Well, it is the rule to do it, but we didn't do it all the time. Q. You didn't do it all the time? A. No, sir. Q. Why didn't you do it all the time? A. We drop them in there without moving them. We dropped them in and never did move them. Lots of times we didn't think it was necessary to go down there.

\*    \*    \*    \*    \*

"Q. When you were making drops of freight cars for storage purposes, like you were in this Hawley drop, did you always notify the employes? A. No, sir.

\*    \*    \*    \*    \*

"Q. Now, Mr. Rankin, it is a fact you made a written statement about this accident to the Southern Pacific railroad? A. Yes, sir. Q. Did you say in your written statement that you had a habit of making drops into that siding without saying anything or notifying the men in the cars that were loading or unloading cars? A. Yes, sir. Q. Did you make that statement? A. Yes, sir.

\*    \*    \*    \*    \*

"Q. Now, did you ever have any agreement with the Doernbecher Manufacturing Company relating to notifying men working in cars that you were going on the tracks? A. No, sir. Q. They never asked you to notify the men in the cars? A. No, sir."

A. J. Carman, conductor of the freight train, gave the following testimony:

"Q. I say, did you know that previous to this accident that these drops had been made on this track without warning the employes? A. Oh, yes. If they think they can do it safely, to save time they do it that way.

\*    \*    \*    \*    \*

"Q. Did you have any understanding with the Doernbecher Manufacturing Company? A. No, sir. Q. (Continuing)—that you were going to make these drops on the tracks without warning the employes in the plant? A. No, sir. I never talked to a Doernbecher man in my life up until today, or since we have been on this trial. Q. In other words, Doernbecher never talked to you. A. No, sir. Q. Or gave you any order not to make drops? A. No, sir; they never did say anything to me about it."

There was testimony to the effect that men working in box cars or on the platform running parallel with the track could not see switching operations being carried on by the train crew.

On the day that plaintiff was injured, the railroad company had no orders to leave cars for the defendant at its siding. The southbound morning freight train had orders to leave five cars on the Hawley siding between Coalca and Oregon City, but on reaching that siding discovered that the track was full, and proceeded southward. When the train reached the defendant's plant the engine and five cars intended for the Hawley siding were disconnected from the rest of the train. The siding switch was then opened by the head brakeman, who then took his station at the passing switch. The engine started the five cars in a southerly direction on the main track and shortly before reaching the switch to the passing track the engine was "cut off" from the cars and proceeded on the main line. As it passed the switch the same was turned, to divert the cars from the main line to the passing track and thence onto the siding. There was a slight down grade and very little momentum was required to move the cars. The swing brakeman, who rode the cars, was unable to apply the brake to more than three of the cars, and was powerless to stop the forward movement

and avoid the impact of the moving cars against the box car in which plaintiff was working, which car was more than 1,000 feet from the north main line switch and about 680 feet distant from the switch connecting the siding with the passing track, north of the plant. When the switched cars struck the one in which plaintiff was working he was knocked from his improvised station and his head struck the top of the car, causing the injuries of which he complains.

This action originally was instituted by the plaintiff against both the present defendant and the Southern Pacific Company. Later the railroad company paid plaintiff $2,000 for his covenant not to sue. The complaint was thereupon amended, eliminating the railroad company from the action.

The acts of recklessness, carelessness and negligence charged by the plaintiff against the defendant are specified in the second amended complaint as follows:

"(a) That said defendant sent the plaintiff into a box car to pile lumber, at a time when it knew, or by the exercise of care should have known that another car was to be spotted upon said side track, and there was great danger to plaintiff in working in the car in which plaintiff was directed to work, under such circumstances.

"(b) That the defendant was careless, reckless and negligent in requiring the plaintiff to stand upon a loose platform of lumber and pile lumber near the top of said box car at the time and place and under the circumstances under which plaintiff was required to work.

"(c) That the defendant was careless, reckless and negligent in that it ordered plaintiff to work in said box car, as aforesaid, without providing any signal or warning to the operators of cars being spotted on said side track, that plaintiff was employed in said box car.

"(d) That the defendant was careless, reckless and negligent in failing to warn plaintiff of the danger existing at the time and place and under the circumstances in which plaintiff was required to work, knowing the danger that existed there at said time, or with that knowledge which would put a reasonably prudent person upon guard, under all of the circumstances and conditions existing at said time and place.

"(e) That it was the duty of the defendant, in view of the work in progress as in this complaint described, to have established communication between the employes of the Southern Pacific Company engaged in switching and the employes of the defendant by means of signals between the employes of said engine and the employes working said box car.

"(f) That the defendant should have provided an employe to stand and watch the switching operation on said spur track who would be instructed to warn the employes working [in] said box car and that cars were being switched on said spur track."

The only assignment of error is the denial of defendant's motions for a nonsuit and for a directed verdict. The defendant based its motion for a directed verdict on the following grounds:

"First, there is no evidence of any negligence on the part of the defendant as alleged in the second amended complaint;

"Second, the evidence shows without contradiction an intervening proximate cause which would insulate any possible negligence which could be claimed existed at the time on the part of the defendant;

"Third, that there is no evidence tending to connect any alleged negligence of the defendant in the case with the proximate cause of the accident."

The motion for a nonsuit was predicated upon the first and third reasons advanced for requesting a directed verdict, and in addition the following:

"Second, that there is no proof of any ownership

of, interest in, or dominion over the track, or any part of the track, by the defendant.

       \*        \*        \*        \*        \*

"Fourth, there is no duty in law to warn the switching crew.

"Fifth, there is no evidence in the case the switching crew were unaware of the presence of the men loading the cars on the platform, and the evidence adduced by the plaintiff is that loading was going on constantly at all hours the mill was in operation."

■ Since we are here considering only the motions for a nonsuit and for a directed verdict, the evidence should be construed in the light most favorable to the plaintiff. The record discloses the following undisputed facts: That by contract the Southern Pacific Company was given full control over the Doernbecher siding; that no cars which had been spotted for use by the defendant had ever intentionally been moved by the railroad company without notification by the employees of that company to some one in charge of the Doernbecher plant, who thereupon gave like notification to any Doernbecher employee working about the cars or siding; that the rules of the Southern Pacific Company required its trainmen, when necessary to disturb cars that were being loaded or unloaded, to give notice first to all persons in or near the cars about to be disturbed; that the Doernbecher siding had frequently been used for storage of cars other than those consigned to the defendant; that this use of the siding had frequently been made without notification to employees of the defendant; that the trainmen had no instructions from the defendant to notify its employees before moving any cars on the siding for storage other than for the use of defendant; that the switches at the ends of the siding were kept

locked when not in use and only the railroad company's employees had keys thereto; and that the defendant did nothing to warn or notify the trainmen by any sign or signal that men were at work loading the cars.

The appellant in its brief states that, "The train crew all knew that men were working on the cars, but were not concerned about them because they intended to stop the five cars long before they got in the vicinity of the loading operations". This statement, however, we do not believe to be borne out by the record. Mr. Beckley testified as follows:

"Q. At the time you started this movement did you know that men were engaged in working on cars down at this plant? A. Well, I didn't pay much attention to it. Q. Whose job was that? A. It is the swing brakeman's job, mostly.

\*　　\*　　\*　　\*　　\*

"Q. What do you know about the percentage of time that loading is going on there on those platforms there at that place, and men at work? Do you know whether the loading is going on constantly or just occasionally? A. Well, I could not say.

\*　　\*　　\*　　\*　　\*

"Q. Did any one in the crew go down and warn the people where they were working in the cars? A. Not that I know of. Q. Why? A. I never seen anybody. . . . Well, we thought that we could put them in with a safe movement and not disturb them.

"Q. Did you know whether they were or were not working there? A. I didn't know whether they were or whether they were not. It was immaterial to us which way it was, because we made the move thinking we could make a safe move. Q. If there had been a sign alongside the switch where you turned the key, that men were loading, you would not have made that drop? A. No, sir; but it is not customary to have signs up."

Conductor Carman had nothing to do with the actual switching of the five cars. The engineer was not

called as a witness. Mr. Rankin testified that he knew at the time the switching was going on that defendant's employees were engaged in loading cars.

The first proposition urged by the appellant is stated as follows: ''Appellant was under no legal duty to anticipate or guard against negligence of the train crew when switching cars on the siding; especially when it had no notice of the intended switching and no power or authority to regulate the conduct of the train.'' It was the duty of the Doernbecher Company to furnish plaintiff a reasonably safe place in which to work. Whether or not the defendant did furnish a safe place was a question for the jury. It was also for the jury to determine whether a reasonably prudent person, under the circumstances shown in this case, would have anticipated and guarded against the negligence of the train crew in switching cars on the siding. The defendant knew or should have known that cars might be switched onto the siding at any time from passing freight trains.

The defendant asserts that the mishap was due entirely to the negligence of the railroad company and that the defendant had no control over the switching operations of that company. A similar contention was made in *Richardson v. Klamath S. S. Co.*, 62 Or. 490 (126 P. 24), and the court in that instance observed:

''A second contention of the defendant is that it had no possession or control over the pile which fell so as to make it responsible for the condition of the same or the manner in which it was built, and that hence the rule requiring the master to provide a reasonably safe place in which to work did not apply to the situation. The deduction sought to be established is that, the lumber having been piled by the mill company in the way it was and by reason of which it fell, the defendant was not responsible for that and could

not be held for the injury resulting. True enough, the defendant was not responsible for the manner in which the mill company had piled its lumber, neither was the plaintiff so responsible; but the defendant had gone there for the purpose of taking this very lumber aboard its ship, and it employed the plaintiff to labor in that matter. There was no privity existing between the plaintiff and the mill company. He looked to, and had a right to look to, the defendant to provide a reasonably safe method of moving the lumber.''

In the case at bar the plaintiff was an employee of defendant, and the selection of a place in which he was directed to work was exclusively within the control of the defendant. The plaintiff himself had no choice in this matter. He was required to work in a place where he could not guard against any negligence of the railroad company in its switching operations on the siding, and it is admitted by the defendant that nothing whatever was done to protect plaintiff from the kind of operations carried on by the train crew at the time the accident occurred, that is, storing upon the siding cars not intended for the defendant.

The second proposition stated by the appellant is that, ''The negligence of the train crew was an intervening cause which insulated any possible negligence on the part of the appellant.'' In support of this argument it is contended that the negligence of the trainmen was the proximate cause of the injury. Such negligence was undoubtedly a concurring cause, but it was not necessarily the sole cause of the injury.

The question of whether the defendant was negligent in one or more of the six particulars alleged in the complaint, and, if negligent, whether such negligence was the proximate cause of plaintiff's injuries, was properly submitted by the court to the jury under appropriate instructions.

It is our opinion that there was sufficient evidence introduced in the record to warrant submission of the case to the jury. We see no reason for discussing the numerous authorities cited by both the appellant and the respondent. The judgment appealed from is affirmed.

KELLY and BEAN, JJ., concur.

RAND, J., dissents.

RAND, J. (dissenting). The facts stated in the prevailing opinion conclusively show that the railroad company and its employees were negligent and that the plaintiff sustained the injury complained of in consequence of such negligence, but there is not one syllable of testimony pointed out nor is a single fact recited in the opinion which shows or tends to show that the defendant now on trial was negligent or failed to perform any duty which it owed to the plaintiff. It had no control over the switching of the cars which caused plaintiff's injury, nor did it know or have any means of knowing that the railroad company intended to make this switching movement at that time, nor did it have any reason to anticipate that such a movement would be made.

It is a novel proposition of law that, because it is the duty of the master to provide a reasonably safe place for his employees to work he must anticipate that some third party, over whose actions he has no control, will negligently do an act which may result in injury to one of his employees, where the master has no knowledge or information or reason to believe that the negligent act is about to be committed.

For these reasons, I can not concur in the majority opinion.